# In the United States Bankruptcy Court
## for the
### Southern District of Georgia
#### Savannah Division

**FILED**
Lucinda B. Rauback, Clerk
United States Bankruptcy Court
Savannah, Georgia
By lbarnard at 9:38 am, Jan 09, 2013

In the matter of:          )

                                  )

INVESTORS LENDING GROUP, LLC   )

                                  )

           *Debtor*       )

Chapter 11 Case

Number <u>11-41963</u>

## ORDER ON CONFIRMATION OF PLAN
## AND OBJECTION TO PLAN BY BANK OF THE OZARKS

### FINDINGS OF FACT

A hearing in the above-captioned matter was conducted on December 11, 2012. Briefly, the history of the case reveals that the Debtor filed a Chapter 11 case on September 21, 2011. Debtor scheduled secured claims of $2,272,700.85, priority claims of $56,571.81, and general unsecured claims of $16,804,631.27. <u>Amended Summary of Schedules</u>, Dckt. No. 98 at 27. Debtor's business purpose is to grant loans, which are secured by non-owner occupied and commercial real estate located primarily in Chatham, Bryan, and Effingham counties. <u>Joint Disclosure Statement</u>, Dckt. No. 295 at 6-7. The loans are generally short term loans to enable clients to renovate, refinance, or construct new projects. *Id.* at 7. Debtor's sources of revenues are interest on loans, rental income from foreclosed properties, late charges, and loan fees. *Id.* at 9.

The Debtor listed approximately seventy-five separate parcels of property with respect to which it either acted as lender or landlord. <u>Schedule A</u>, Dckt. No. 1. One of

℀AO 72A
(Rev. 8/82)

the creditors to which Debtor owed money on the date of filing was Bank of the Ozarks. Schedule D, Dckt. No. 1. The debt scheduled as owing to Bank of the Ozarks on the filing date was $888,465.20, and the debt was secured by twelve separate pieces of real property in Chatham County, Georgia, with an aggregate value stated by the Debtor of $1,508,601.00. Schedule D, Dckt. No. 1.

The case progressed through a number of hearings and ultimately the Debtor filed a Disclosure Statement and Plan on February 17, 2012. Dckt. Nos. 102, 103.[1] The Disclosure Statement and Plan generally provided, with regard to BTO, that the Debtor would retain all of the property pledged to BTO, and BTO would retain its lien on the properties. A new note would be executed with a loan amount of $695,549.08[2] and a 5.25% interest rate, amortized over twenty years, along with an Assignment of Leases and Rents in favor of BTO. The release prices for each collateralized property when sold would be sixty percent of such property's scheduled value as of the petition date. The Disclosure Statement averred that the total indebtedness to BTO equaled approximately 57% of the value of all collateralized properties.

The case was scheduled for a hearing on the Disclosure Statement on April

---

[1] Debtor subsequently made several amendments to the Disclosure Statement and Plan. *See* Dckt. Nos. ·108, 114, 115, 163, 164, and 187.

[2] Debtor had continued to make monthly payments to BTO based on the terms of the matured note. In addition, BTO held a Certificate of Deposit belonging to the Debtor, as additional security, and a checking account, both of which BTO set-off in the total amount of $210,030.14. That amount was applied to Debtor's principal balance, reducing BTO's Claim. Dckt. No. 103 at P-9.

17, 2012, and BTO filed an objection to Debtor's valuation of BTO's collateral. Dckt. No. 132. BTO argued that because Debtor intended to maintain possession of BTO's collateral, the replacement, or fair market, value should be used. *Id.* at 2.[3] BTO stated that Debtor failed to provide accurate information about the allowed claims of creditors because it did not provide the fair market value of these properties. *Id.* at 3. The hearing was continued.

A creditors' committee (the "Committee") which remained active throughout the case, was appointed on October 17, 2011. Dckt. No. 18. The Committee filed a competing proposed Plan and Disclosure Statement on July 25, 2012. Dckt. Nos. 203, 202. Debtor filed a recast Plan and Disclosure Statement on August 1, 2012. Dckt. Nos. 206, 207.

Ultimately Debtor and the Committee filed a Joint Disclosure Statement and Plan on August 28, 2012. Dckt. Nos. 231, 232. Debtor and the Committee altered Debtor's earlier proposed treatment of BTO so as to propose surrender of five of the twelve parcels of property to BTO in full satisfaction of its claim. *See* Dckt. No. 231 at 61; Dckt. No. 232 at 7-9. This plan proposed to retain the other seven with which to fund its future operations and payment to other creditors. Debtor and the Committee proposed values at that time of $1,536,300.00 for all twelve properties. Dckt. No. 231 at 61. The total value of the properties the Joint Disclosure Statement and Plan proposed to surrender to BTO was $744,300.00. Dckt. No. 232 at 8.

---

[3]In its objection, BTO provided a list of nine of its collateralized properties, comparing the Debtor's Disclosure Statement values with BTO's appraisal values. BTO's appraisal values were higher than Debtor's values of each property, even by as much as $220,000.00 on one of the properties. Dckt. No. 132 at 2.

BTO then objected to the Joint Disclosure Statement, claiming that the proposed valuation of the partial surrender plan was excessively high. Dckt. No. 265. At the hearing to consider approval of the Joint Disclosure Statement, BTO advised the Court that it had engaged the services of an MAI appraiser to update the values it appeared Debtor and the Committee had relied on in their Joint Disclosure Statement and Plan. BTO contended that new appraisals were necessary because the previous appraisals were out-of-date or inaccurate in the current market environment. Debtor reserved the right to hire its own appraisal firm in the event it was dissatisfied with the figures arrived at by the lender's appraiser. Upon subsequently reviewing the lender's appraisals, Debtor and the Committee believed that the new values were lower than their appraiser might propose; however, in light of the desire to curtail further appraisal and legal expenses in engaging in a contested valuation hearing, Debtor and the Committee conceded that the lender's values would be accepted and incorporated into a second proposed Joint Disclosure Statement and Plan.

To that end, the Debtor and the Committee altered the treatment of BTO to increase the number of properties it would surrender from five out of twelve to seven out of twelve, utilizing the BTO appraisals in determining the proposed values of the properties. The Amended Joint Disclosure Statement dated October 22, 2012, was approved by the Court and that Disclosure Statement, together with the Second Amended Joint Plan, were served out to all parties in interest. Dckt. No. 309. Ultimately, objections of all the other parties involved in the case other than BTO were resolved and the matter came on for a trial to determine whether the values set forth in the Disclosure Statement and Plan are binding

on BTO or whether BTO could, as it wished to do, force a surrender of all of the real estate in full satisfaction of the debt. The parties filed a Pre-Trial Stipulation on November 26, 2012. Dckt. No. 337. Based on the stipulation, the Court finds the following:

The balance due on the note to BTO as of the hearing date of $694,313.95, along with accrued interest and appraisal fees, totals $714,067.48 plus $127.77 per diem in interest. The total Disclosure Statement approved value of the twelve properties is $940,000.00, and the October 22 Joint Plan proposes a surrender of seven of those properties to the aggregate value of $752,000.00. The Debtor proposes retaining the remaining five parcels with an aggregate value of $188,000.00.

Taking principal, accrued interest, appraisal fees, and estimated accrued attorney's fees of $27,000.00, BTO claims a total indebtedness of approximately $744,000.00 and contends that (1) a surrender of $752,000.00 in Disclosure Statement value provides it with an insufficient equity cushion; and (2) the $752,000.00 figure should be revisited and adjusted to account for the fact that the property's value (a) should be reduced to a liquidation value, or (b) should include certain carrying costs not contemplated by the Bank's appraisal. For example, the typical real estate commission of six percent, additional closing costs that might be imposed upon the seller, and maintenance and repair of the properties surrendered to the lender are, arguably, not accounted for in the valuation approved by the Court in the Joint Disclosure Statement.

Testimony revealed that BTO's appraiser was engaged in August, that twelve appraisals were completed and delivered to BTO, and that the appraisal standard utilized was fair market value, meaning, according to the appraiser, what a willing buyer would pay a willing seller, neither one operating under any duress. She further testified that a liquidation value is usually lower because it contemplates sale within a shorter time frame. She was asked to render an opinion of what the reduction would be if an assumption had been made that liquidation value would be the proper standard. She testified that the properties identified as numbers two, four and five[4] would be approximately twenty percent lower for a total of $103,000.00. Properties one, six, seven, nine and eleven[5] would be approximately seven and a half percent lower for an aggregate reduction of $19,725.00, and four of the properties, numbers three, eight, ten and twelve,[6] would be the same as set forth in the appraiser's original report. She also testified that there was no adjustment made for accruing taxes or for a typical six percent commission by a selling realtor. However, she did build into the appraisal a contemplated three to six month holding period in order to arrive at the estimated values.

BTO also called its executive vice president for the Savannah market who is actively, if not exclusively, engaged in disposing of distressed property in BTO's portfolio.

---

[4]The properties located at S. Campbell St., Whitaker St., and Old Shell Rd., respectively.

[5]The properties located at Kingman Ave, Alaska St., W. 40th St., Carver St., and Mercer Point, respectively.

[6]The properties located at Reynolds St., E. Waldburg St., Crosby St., and Augusta Ave., respectively.

He testified that any current underwriting by BTO, on a loan to value basis, would be fifty percent, although it was much higher in the past when underwriting standards were less rigorous. He conducted a survey of all of the bank owned property that he has been engaged in reselling since 2010 and concluded that, in the aggregate, BTO is recovering approximately sixty-nine percent of what it considers the fair market value of the properties. The following factors contribute to this recovery percentage: (1) the stigma of bank owned property, which causes purchasers to believe that bank owned property is distressed to the point where they can buy it at a discounted amount; (2) a typical six percent realtor's commission, two percent closing cost imposed on the seller, and certain maintenance and upkeep items during the holding period; and (3) the fact that the bank cannot make any representations, warranties, or disclosures concerning the condition of the property.

BTO's witness did not know whether the appraisal was ordered at a time before or after the Debtor's Plan had converted from a "retain and pay" scenario to a "partial surrender in full satisfaction."[7] In any event, by the time the Joint Disclosure Statement came on for a hearing, the Joint Disclosure Statement and Plan dated October 22, 2012, did provide for partial liquidation in full satisfaction of the claim and retention free and clear of liens of the remaining five parcels of property. Dckt. Nos. 295, 296. The Joint Disclosure Statement was approved, and the Court entered an Order reciting that "[t]he values of assets listed in

---

[7]A pleading filed by BTO recites that the appraisal was ordered in July 2012, at a time when Debtor's plan still provided for a retention of the properties *See* Dckt. No. 265 at 2. In late July 2012, however, the Committee filed its own disclosure statement and plan that proposed surrendering five properties in full satisfaction of BTO's claim. It is unclear whether BTO ordered the appraisals before or after this plan and disclosure statement were filed. Dckt. Nos. 202, 203.

Exhibit 'A' of the Amended Joint Disclosure Statement and the priority of liens on those assets are hereby approved by the Court pursuant to § 506 of the Bankruptcy Code." Dckt. No. 309.

Debtor and the Committee contend that the approval of the property values at a time when the Plan and Disclosure Statement clearly provided there would be a partial surrender (in other words, a partial liquidation of the Debtor's assets in exchange for full satisfaction of BTO's claim) precludes BTO's argument that the Court should reduce those approved values because of the anticipated liquidation of the properties. BTO contends that the values, despite the fact that they were approved as part of the Disclosure Statement process, are still subject to change because until the Plan is confirmed, the Plan may be modified. As an alternative argument BTO contends that, even if the values remain intact as a result of this Court's ruling, in determining whether the Bank will receive the indubitable equivalent of its claim as required by § 1129(b)(2)(A), the Court can reduce the proposed surrender values by an amount which takes into account realtor's commissions, closing costs, accruing interest and other unspecified maintenance expenses.

## CONCLUSIONS OF LAW

11 U.S.C. §1129 governs confirmation of a Chapter 11 plan of reorganization. Section 1129(b) allows for confirmation of a plan over a creditor's objection as long as certain requirements are met. One such requirement for cramdown is that the plan be "fair and equitable" and provide a secured creditor the "indubitable equivalent" of its

claim. 11 U.S.C. §1129(b)(2)(a). BTO's treatment in the Joint Plan must therefore provide BTO the indubitable equivalent of its approximately $744,000.00 claim. "If a creditor's claim is oversecured, then the indubitable equivalent of the creditor's claim is its face value. For instance, where a creditor has a $100,000 lien on an asset worth $500,000, a reorganization plan will only give the creditor the indubitable equivalent of its claim if it gives it something worth $100,000...." River Road Hotel Partners, LLC v. Amalgamated Bank, 651 F.3d 642, 650 (7th Cir. 2011).

Here, Debtor and the Committee propose a "partial dirt-for-debt" plan in which Debtor will surrender certain collateralized property to provide BTO with the indubitable equivalent of its claim. This Court has previously upheld, in a cramdown context, the use of partial dirt-for-debt plans in full satisfaction of an oversecured creditor's claim. See In re May, 174 B.R. 832 (Bankr. S.D. Ga. 1994) (Davis, J.) (Partial surrender of oversecured creditor's collateral in full satisfaction of creditor's claim provided creditor with "indubitable equivalent" of its claim).

In "dirt-for-debt" plans, courts use § 506 of the Bankruptcy Code to value property and determine whether property to be surrendered provides the "indubitable equivalent" of a secured claim. See, e.g., Matter of Atlanta Southern Bus. Park, Ltd., 173 B.R. 444, 449-50 (Bankr. N.D. Ga. 1994) ("[A] bankruptcy court may value property under 11 U.S.C. § 506(a) for the purpose of the indubitable equivalent standard."). Section 506 permits a bankruptcy court to establish the value of property in a bankruptcy case. In re

Arnold and Baker Farms, 177 B.R. 648, 655 (B.A.P. 9th Cir. 1994). That value "shall be determined in light of the purpose of the valuation and of the proposed distribution or use of such property and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest." 11 U.S.C. § 506(a)(1).

Debtor and the Committee argue that because, at the time of the hearing on the Joint Disclosure Statement, the Plan provided for partial surrender of BTO's collateral in full satisfaction of the debt, the values that were adopted by consent of both parties must be viewed in light of the proposed disposition or use, which is surrender. BTO contends that because the appraiser used a fair market value standard, it is inappropriate to use the approved values without a discount for the difference between fair market value and liquidation value.

In a Chapter 13 case the Supreme Court was faced with the flip side of this argument in deciding whether foreclosure value, replacement value,[8] or some other value between the two should be used to value a motor vehicle which the debtor proposed to retain through the life of a Chapter 13 plan. Associates Commercial Corp. v. Rash, 520 U.S. 953 (1997). In Rash, the debtor proposed a foreclosure value for the motor vehicle, to which the creditor objected. Id. at 957. The Court concluded that because the "proposed use" was to

---

[8]The Court defined "replacement value" as the "price a willing buyer in the debtor's trade, business, or situation would pay a willing seller to obtain property of like age and condition." Rash, 520 U.S. at 959.

AO 72A
(Rev. 8/82)

retain the collateral,[9] the replacement, not the foreclosure, value was the proper measure of valuation. *Id.* at 964-65.

       With that standard in mind and reading the <u>Rash</u> case in its entirety, this Court holds that the converse is also true.  If a proposal before the Court is to surrender property in whole or in part, then a foreclosure or liquidation type value is the proper standard. BTO contends this standard was not reflected in its appraisals, and thus the approved Joint Disclosure Statement values should be adjusted. However, when parties agree upon a value without any qualification and under the shadow of a proposal for partial surrender in full satisfaction, they are estopped from arguing that such agreed upon value is not a foreclosure value in the context of a proposed disposition to liquidate.

       Judicial estoppel is an equitable doctrine invoked at a court's discretion and intended to prevent litigants from asserting positions in one proceeding that would be inconsistent with positions asserted in other proceedings. <u>Burnes v. Pemco Aeroplex, Inc.</u>, 291 F.3d 1282, 1285 (11th Cir. 2002).The Supreme Court has noted that "the circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general formulation of principle." <u>New Hampshire v. Maine</u>, 532 U.S. 742, 750 (2001) (quoting <u>Allen v. Zurich Ins. Co.</u>, 667 F.2d 1162, 1166 (4th Cir. 1982)). Nevertheless, the Court has provided several factors that may inform the decision whether to apply the doctrine

---

[9]The Court emphasized that surrender and retention are not equivalent acts, and thus under § 506, valuation must be adjusted in light of these separate and distinct proposed uses. *Id.* at 962.

in a specific case: (1) whether a party's later position is "clearly inconsistent" with its earlier position, (2) whether the party has succeeded in persuading a court to accept that party's earlier position, and (3) whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. *Id.* at 750-51.

The Eleventh Circuit has applied two factors within this framework in the application of judicial estoppel to a particular case: (1) whether the allegedly inconsistent positions were made under oath in a prior proceeding, and (2) whether the inconsistencies are shown to have been calculated to make a mockery of the judicial system. Burnes, 291 F.3d at 1285. However, both the Eleventh Circuit and the Supreme Court have explained that these factors are not inflexible or exhaustive, and that courts must give due consideration to all the circumstances of a particular case when considering the applicability of the doctrine. Burnes, 291 F.3d at 1286; New Hampshire, 532 U.S. at 751.

Based on the circumstances of this case, the Court holds that BTO is estopped from asserting that the approved Joint Disclosure Statement values do not represent a liquidation or foreclosure value. Here, the Court, in approving the Joint Disclosure Statement, accepted the values proffered by BTO, and Debtor did not conduct additional appraisals because of the understanding that these values would be utilized. Although there was no specific stipulation by the parties as to whether the values established in the Joint Disclosure Statement and approved by the Court were in the nature of foreclosure or

replacement values, the context of that settlement, coupled with a "proposed use or disposition" to surrender, leads me to conclude that the parties are bound by those values as representing a realistic liquidation value. *See, e.g.*, *In re Vaniman Int'l, Inc.*, 22 B.R. 166, 193-94 (Bankr. E.D.N.Y. 1982) (parties who had previously contended that value of property was same as that testified to by mortgagee's expert in proceeding by mortgagee seeking relief from stay, were judicially estopped from later insisting on a higher value in fraudulent conveyance action.).

Precedent in "dirt for debt" cases, however, has to be considered and it generally leads to the conclusion that if a Plan is to be confirmed which approves "dirt-for-debt" or "partial dirt for debt," the decision must be so conservatively or sparingly applied as to ensure that the lender forced over its objection to accept property in satisfaction of a claim receives the indubitable equivalent of cash. *See In re SUD Properties, Inc.*, 2011 WL 5909648 at *6 (Bankr. E.D.N.C. 2011) ("Many courts when valuing collateral in 'dirt-for-debt' plans have taken conservative approaches."); *see also In re Bannerman Holdings, LLC*, 2010 WL 4260003 at *4 (Bankr. E.D.NC. 2010) ("[V]aluation is not an exact science, and the chance for error always exists. A conservative approach should, therefore be taken in order to protect the secured creditor in this regard.").

That being the case, I hold that, although BTO should be bound by the determinations of value made by the Court in the Order approving the Joint Disclosure Statement as a starting point, in this instance that number should be adjusted by any relevant

factor the parties did not contemplate in stipulating to the value of the real property. This adjustment ensures that I have employed a conservative approach in achieving indubitable equivalence. Thus, I conclude that in order to sell the property at the price contemplated by the appraisal and achieve the highest and best price, not only would the property be subject to the three to six month holding period the appraisal contemplated, but would be subject to an eight percent reduction in the net amount received by the lender on account of a typical realtor's commission and the expected closing costs that would be imposed on BTO as seller.

The current values of the seven properties to be surrendered are $752,000.00. BTO's claim totals $744,000.00. I find that the values listed in the approved Joint Disclosure Statement will be subject to an eight percent reduction to account for realtor's commission and closing costs. Therefore, in order for the Plan to be confirmable as "fair and equitable" and to provide  BTO the "indubitable equivalent" of its claim, confirmation is denied unless the Plan is amended to surrender properties totaling $810,000.00 in Disclosure Statement value, no later than January 29, 2013. That number, after deduction of eight percent in likely costs, will yield the amount necessary to cover the BTO debt.

## O R D E R

Pursuant to the foregoing, IT IS THE ORDER OF THIS COURT that confirmation of the Joint Plan of Reorganization (Dckt. No. 296) is DENIED.  If Debtor and the Committee file an amended Plan by January 29, 2013, pursuant to the above findings, the

Plan will be confirmed without further notice or hearing.

_____
Lamar W. Davis, Jr.
United States Bankruptcy Judge

Dated at Savannah, Georgia

This _____ day of January, 2013.